## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **RICHARD H. NASH, IV,** | ) | |
| | ) | **No. 24 CV 2165** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Magistrate Judge Young B. Kim** |
| | ) | |
| **PAMELA J. BONDI, Attorney** | ) | |
| **General of the United States,** | ) | |
| | ) | **January 26, 2026** |
| **Defendant.** | ) | |

### MEMORANDUM OPINION and ORDER

Plaintiff Richard H. Nash, IV filed this action against the government alleging that the FBI discriminated against him based on his disability, in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 791. Before the court is the government's motion for summary judgment. For the following reasons, the motion is granted:

### Facts

Nash accepted an offer in November 2022 to join the FBI as a Special Agent. (R. 37, Govt.'s Stmt. of Material Facts ("GSOF") ¶ 7; R. 43, Nash's Resp. to Govt.'s Stmt. of Facts ("NRGSOF") ¶ 7.) The FBI's offer letter instructed Nash to report to the FBI's 18-week Basic Field Training Course ("BFTC") in Quantico, Viriginia on December 4, 2022, and informed him that the successful completion of this course was a condition of his appointment. (Id.) The offer letter also explained that "[v]oluntary resignation from BFTC before graduation will be considered a breach of contract between you and the U.S. Government.," and "[t]rainees who voluntarily

resign are barred from returning to the Special Agent program in the future." (R. 37-1, Ex. 1 at 7.)

The FBI offered Nash basic information about the BFTC in a welcome email sent on November 9, 2022. (R. 37, GSOF ¶¶ 8-9; R. 43, NRGSOF ¶¶ 8-9.) Among other things, the email explained that overnight leave was "generally allowed" after the third week of training and that trainees could "go off campus for short trips (shopping, etc.)" from "day one," provided they returned to the training center by midnight. (R. 37, GSOF ¶ 9; R. 43, NRGSOF ¶ 9.) The email also noted that communal refrigerators were available in all dormitory buildings and one building had communal microwaves. (R. 37, GSOF ¶ 10; R. 43, NRGSOF ¶ 10.)

Nash suffers from severe anaphylactic and non-anaphylactic food allergies and has a benign tumor that requires self-injection of medication that must be refrigerated. (R. 37, GSOF ¶ 5; R. 43, NRGSOF ¶ 5.) After receiving the welcome email, Nash contacted his application coordinator, Special Agent Molly Bob ("SA Bob"), to ask whom he should contact about his need for accommodations related to his allergies and medication. (R. 37, GSOF ¶¶ 11-12; R. 43, NRGSOF ¶¶ 11-12.) On November 14, 2022, SA Bob responded that she "forwarded [Nash's] medical questions on to the medical team, but really, everything, including allergies, are handled once you get there. Good luck!" (R. 37, GSOF ¶ 13; R. 43, NRGSOF ¶ 13.)

Nash emailed the FBI's Reasonable Accommodations office the following day, on November 15, 2022, stating in relevant part:

> I understand meals are provided at Quantico during training, however
> I don't know how meals work exactly at Quantico. If there is a way for

2

> me to prepare my own meals on site in my dorm each night, I can simply bring my lunch with me in a lunch bag during the working hours. That would be greatly appreciated and likely easiest for everyone due to cross contamination issues in shared kitchens, etc. If that is not possible I was wondering if there was someone I should be in contact with for meal accommodations so that I can report my dietary restrictions and coordinate meals appropriately.

(R. 37, GSOF ¶ 14; R, 43, NRGSOF ¶ 14.) In response, the FBI put him in contact with Leisa Christafore, the FBI's Reasonable Accommodations Program Coordinator, who in turn connected him with Leah Decker, the dietician for the vendor operating the training center's cafeteria. (R. 37, GSOF ¶¶ 15, 17; R. 43, NRGSOF ¶¶ 15, 17.)

After Decker spoke with Nash at length about his allergies and cross-contamination concerns, she advised him that staff would prepare a separate plate of safe food for him. (R. 37, GSOF ¶¶ 16, 18; R. 43, NRGSOF ¶¶ 16, 18.) But she also warned Nash that he may need to ask multiple cafeteria workers for help getting his plate because some workers had developmental or other disabilities. (R. 37, GSOF ¶ 19; R. 43, NRGSOF ¶19.) Decker told Nash that problems could be raised with "a supervisor (I believe they are still wearing blue polos)." (R. 37, GSOF ¶ 19; R. 43, NRGSOF ¶ 19.) And she said that the cafeteria would prepare separate plates for him starting with "Sunday dinner as you might be arriving after lunch," and noted that "[p]icking it up Sunday night will also help get the lay of the land of the cafeteria as it can get crowded during lunch." (R. 37, GSOF ¶ 20; R. 43, NRGSOF ¶ 20.) Decker explained where Nash could collect his plate, informed him of a safe cereal, and told him to let her know if he had "any issues or want[ed] to change the frequency of the

plate" to something less than daily at lunch and dinner. (R. 37, GSOF ¶¶ 19, 21; R. 43, NRGSOF ¶¶ 19, 21.)

Nash separately discussed his need for accommodations with Christafore. (R. 37, GSOF ¶ 22; R. 43, NRGSOF ¶ 22.) During their discussions, Christafore told Nash he was not required to eat in the cafeteria, could bring his own food, and would have a mini fridge in his dorm room and access to a communal microwave. (R. 37, GSOF ¶ 23; R. 43, NRGSOF ¶ 23.) She also wrote, "My understanding is afterhours and weekends you are allowed to leave." (Id.)

On December 1, 2022, Nash submitted a written request for accommodations to Christafore asking for a refrigerator and access to a microwave and modified the request the following day to include a dorm room with "kitchen/kitchenette." (R. 37, GSOF ¶¶ 24-26; R. 43, NRGSOF ¶¶ 24-26.) Christafore responded that same day, Friday, December 2nd, advising Nash that there were no kitchenettes, but that she was looking into placing a microwave in his room or in an area where "no one else will be using." (R. 37, GSOF ¶ 27; R. 43, NRGSOF ¶ 27.) Nash emailed Christafore the next day, Saturday, December 3rd, asking for an update on his accommodations request, but did not receive a reply that day. (R. 37, GSOF ¶¶ 28-29; NRGSOF ¶¶ 28-29.)

On Sunday, December 4th, Nash arrived at Quantico midday and met Special Agent Karen Brown ("SA Brown") at check-in. (R. 37, GSOF ¶ 30; R. 43, NRGSOF ¶ 30; R. 43, Nash's Stmt. of Add'l Facts ("NSOAF") ¶ 62; R. 46, Govt.'s Response to Nash's Stmt. of Add'l Facts ("GRNSOAF") ¶ 62.) After Nash explained to SA Brown

4

his allergies and requests for accommodations, she introduced him to Supervisory Special Agent Matt Carpenter ("SSA Carpenter"), Nash's assigned counselor at Quantico. (R. 43, NSOAF ¶¶ 62-63; R. 46, GRNSOAF ¶¶ 62-63.) According to Nash, SA Brown said SSA Carpenter would work through the accommodations process with him. (R. 43, NSOAF ¶ 62.) However, the FBI denies that SSA Carpenter had any authority to grant or deny an accommodations request, (R. 46, GRNSOAF ¶ 62), and offers SA Brown's testimony that she told Nash she had not received notice of his request but "would work through the process," (R. 37, GSOF ¶¶ 32-33.) She also told Nash he could leave the campus after hours, provided he returned by curfew. (Id.) Nash denies Brown's testimony. (R. 43, NRGSOF ¶¶ 32-33.)

When Nash checked into his dorm room at Quantico, neither a mini fridge nor microwave was in his room. (R. 37, GSOF ¶ 34; R. 43, NRGSOF ¶ 34.) That evening Nash called SSA Carpenter to ask about his accommodations request, describing his need for a refrigerator as "the most immediate thing" so he could properly store his medication. (R. 43, NSOAF ¶ 64; R. 46, GRNSOAF ¶ 64.) But Carpenter said he "didn't know anything about" the request and instructed Nash to "ask other new agents" for a refrigerator. (R. 43, NSOAF ¶¶ 65-66; R. 46, GRNSOAF ¶¶ 65-66.) Nash eventually found a communal refrigerator to store his medication. (R. 37, GSOF ¶¶ 35-36; R. 43, NRGSOF ¶¶ 35-36; R. 43, NSOAF ¶ 67; R. 46, GRNSOAF ¶ 67.) But Nash did not visit the cafeteria on December 4th despite Decker's suggestion. (R. 37, GSOF ¶ 31; R. 43, NRGSOF ¶ 31.)

The BFTC began at 8:00 a.m. the following day on December 5th. (R. 43, GSOF ¶ 40; NRGSOF ¶ 40.) That morning, Nash again asked SSA Carpenter about his accommodations request, but Carpenter still had no information. (R. 43, NSOAF ¶ 68; R. 46, GRNSOAF ¶ 68.) According to Nash, SSA Carpenter also said the "accommodations person" was out of the office until December 13th and when Nash asked if he could leave the campus to get food or have his wife bring some "until we figure out what's going on," Carpenter said neither was allowed. (R. 43, NSOAF ¶ 68.) Nash's understanding from this conversation was that "my direct supervisor was telling me that I would not be receiving accommodations[,] period." (Id.) The FBI disputes that SSA Carpenter told Nash he could not leave the campus or have food delivered to him, citing the welcome email as support. (R. 46, GRNSOAF ¶ 68.) Later that day, Nash went to the cafeteria for the first and only time while at Quantico and approached a cafeteria employee about his dietary needs. (R. 37, GSOF ¶ 42; R. 43, NRGSOF ¶ 42.) The employee was not helpful, but Nash did not ask to speak with a supervisor or approach any other employee, and he also did not ask to use a microwave. (R. 37, GSOF ¶¶ 37-38, 42; R. NRGSOF ¶¶ 37-38, 42.) That afternoon, Christafore informed Nash, "I still have not received any responses from Training Division." (R. 37, GSOF ¶ 29; R. 43, NRGSOF ¶ 29.)

Later that same day, Nash left the BFTC for good, having eaten only the snacks he brought with him to Quantico. (R. 37, GSOF ¶¶ 39, 43; R. 43, NRGSOF ¶¶ 39, 43.) He did not contact Christafore, Decker, or SA Bob at any time before

leaving, (R. 37, GSOF ¶ 46; R. 43, NRGSOF ¶ 46), but emailed them the following afterwards:

> I am sad to inform you that I have voluntarily removed myself from the BFTC 23-01 program. I have left base and I am on my way home now. I have copied my applicant coordinator and another SA who was informed of some of these accommodations issues along the way. Unfortunately, I was not provided an email for any of my section staff so I was unable to provide a written resignation from the program, and when I attempted to call my assigned counselor it did not go through. If there is any way for any of you to notify them, I would greatly appreciate that as I may be unable to communicate while traveling. Additionally, I was unsure of what to do with my issued uniforms and equipment so I simply left them in my dorm room, which is Washington unit 241.
>
> The reason for my voluntary dismissal is that upon my arrival the accommodations I needed to succeed were not present. I was informed from the training staff that I would not be receiving them despite putting in the appropriate application for reasonable accommodations. Due to this, I was unable to store my medication appropriately and I was unable to manage my dietary restrictions in such a way that would allow me to eat little more than snack foods for the last two days. The cafeteria staff were not able to help me when I requested a special meal despite being assured that there would be accommodations. I'm not sure if there was a miscommunication in the pipeline somewhere, but once I was informed I would not receive the accommodations requested I knew that I would not be able to keep up in the program without being able to manage my dietary restrictions in such a way that would allow me to succeed with PT and class work.
>
> I apologize for any inconvenience, and I want to thank everyone again who has helped me along the way. I wish you all the best of luck in all your current and future endeavors.

(R. 37, GSOF ¶¶ 43-44; R. 43, NRGSOF ¶¶ 43-44; R. 43, NSOAF ¶¶ 69-70; R. 46, GRNSOAF ¶¶ 69-70.) Christafore did not respond to Nash for several days, but SA Bob responded that evening, apologizing and acknowledging Nash's likely disappointment, and indicating that she had "requested a phone call with Quantico

to better understand what happened." (R. 43, NSOAF ¶¶ 71, 73; R. 46, GRNSOAF ¶¶ 71, 73.)

The day after Nash left Quantico, December 6th, Nash and SA Brown had a call during which Nash says Brown asked if he wanted to return to the BFTC and offered to speak to management to determine whether he would be dismissed or allowed to return to the training course he just left or to a new class. (R. 43, NSOAF ¶ 75.) SA Brown's testimony is that she told Nash he was considered to have "voluntarily resigned" and would need to report to the FBI's Chicago field office to turn in his badge and sign paperwork to "close the loop." (R. 46, GRNSOAF ¶ 75.) She says when Nash asked if he had other options, she told him he might have had he not left in the "middle of the night" after "less than 36 hours" and "without trying to remedy the problem," but under the circumstances she would "need to talk with executive management" to see whether he had options. (Id.) The FBI thereafter discussed internally whether Nash could return to the BFTC but ultimately reiterated on December 7th that he must report to the Chicago office on December 9th for an exit interview. (R. 37, GSOF ¶ 50; R. 43, NRGSOF ¶ 50; R. 43, NSOAF ¶¶ 76, 78; R. 46, GRNSOAF ¶¶ 76, 78.)

Nash arrived at the Chicago office on December 9, 2022, as instructed. (R. 37, GSOF ¶ 51; R. 43, NRGSOF ¶ 51.) SA Bob, Special Agent Robert Leary ("SA Leary"), and another supervisor presented Nash with a "voluntary resignation form" to sign. (R. 37, GSOF ¶¶ 51-52; R. 43, NRGSOF ¶¶ 51-52.) Nash refused to sign it, citing "mental reservations due to the information communicated and provided to [him]

regarding [his] reasonable accommodation," and offered his own "Personal Statement" instead, which states in part:

> This experience has made me feel singled out, discriminated against, and more than anything . . . extremely disappointed and let down. I felt that I was chosen for the Special Agent program for my skills and ability, merit, experience, and dedication to the position. Being unable to continue the SA program due to a medical necessity that was filed and submitted, and not receiving the support required or expected has been one of the biggest disappointments in my entire life. I write this statement with hope that the FBI will learn from this experience so that it will not happen to someone else in the future, and I thank you for taking my experience into consideration.

(R. 37, GSOF ¶¶ 52-53; R. 43, NRGSOF ¶¶ 52-53.) During the meeting, Nash asked SA Leary, "how to get back to Quantico." (R. 43, NRGSOF ¶ 54.) Leary responded that it was "up to Molly Bob . . . and the people at Quantico," and told Nash he should contact an attorney—his standard response when someone "feel[s] like they've been wronged." (R. 43, NRGSOF ¶¶ 54-55.) The FBI ultimately classified Nash's departure as a voluntary resignation effective December 5, 2022, the day he left Quantico. (R. 37, GSOF ¶ 56; R. 43, NRGSOF ¶ 56.)

The following week, on December 16, 2022, Christafore wrote to Nash apologizing for the "late response," explaining that she had been "on travel" and was "catching up on" emails. (R. 54, NSOAF ¶ 82; R. 46, GRNSOAF ¶ 82.) She also apologized that the "Training Division (TD) did not respond to [her] with an answer [to] your request" and advised Nash that she had notified the TD that she "no longer need[ed] a response." (Id.) A week later, Nash sought legal counsel. (R. 37, GSOF ¶ 57; R. 43, NRGSOF ¶ 57.)

9

Five months later on May 17, 2023, Nash's then attorney[1] sent a letter to the FBI's Equal Employment Opportunity ("EEO") office stating in part, "I am writing to you as legal counsel for my client, Richard Nash, regarding a complaint filed against your organization alleging violations" of the Rehabilitation Act, and requesting "an update on the status of the complaint." (R. 37, GSOF ¶ 58; R. 43, NRGSOF ¶ 58.) Nash admits this was the first time since his December 9, 2022 exit interview that he or his attorney contacted the FBI regarding any employment-related grievance or claim. (R. 37, GSOF ¶ 59; R. 43, NRGSOF ¶ 59.) Nash then filed an employment discrimination claim with the FBI on August 4, 2023, (R. 37, GSOF ¶ 60; R. 43, NRGSOF ¶ 60), but the FBI dismissed the claim on December 18, 2023, because Nash failed to contact an EEO counselor within 45 days of the alleged discrimination, (R. 37, GSOF ¶ 61; R. 43, NRGSOF ¶ 61). Nash responds that the FBI did not notify him of the 45-day time limit to contact an EEO counselor or any procedure for reporting workplace discrimination, (R. 43, NSOAF ¶ 84), and the FBI admits it did not do so, (R. 46, GRNSOAF ¶ 84).

## Analysis

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The court considers the entire evidentiary record but must view all the evidence and draw all reasonable inferences therefrom in the light most favorable

---

[1] Nash is represented by new counsel in connection with this lawsuit.

to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). But to survive summary judgment, the nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Viewing the record under this standard, the court finds that the government is entitled to summary judgment.

## A.    Timeliness

The government argues that this lawsuit fails out of the gate because Nash did not timely contact an EEO counselor regarding his discrimination claim. (R. 38, Govt.'s Mem. at 5-8.) A federal employee alleging discrimination must initiate contact with an EEO counselor within 45 days of the alleged discrimination. 29 C.F.R. § 1614.105(a)(1). This requirement is not jurisdictional, *Johnson v. Runyon*, 47 F.3d 911, 917 (7th Cir. 1995), but an employee's claim is barred if it is not met absent an "occasion for equitable tolling," *Lapka v. Chertoff*, 517 F.3d 974, 981 (7th Cir. 2008).

The government is correct as a technical matter that Nash failed to timely contact an EEO counselor. (R. 38, Govt.'s Mem. at 5.) But Nash points out that "counselor" is not defined in the applicable regulation and both that regulation and the Rehabilitation Act are to be liberally construed. (R. 44, Nash's Resp. at 9 (citing *Johnson*, 47 F.3d at 917 (holding that Rehabilitation Act is "remedial legislation that

must be construed liberally to effectuate its purposes" and courts should also "liberally construe the [(a)(2)] exceptions")).) Nash says because he reported the issue directly to multiple FBI officials and those reports were conveyed to others, the FBI "could have 'investigated and resolved the matters internally to avoid unnecessarily burdening the courts,'" but failed to do so. (Id. at 11-12.) Nash is correct in at least some respects.

Contrary to the government's suggestion, it does not matter that Nash failed to contact an FBI "EEO Counselor." The EEOC has consistently held that a complainant satisfies the 45-day contact requirement by "initiating contact with *any agency official logically connected with the EEO process*, even if that official is not an EEO Counselor," provided the complainant "exhibit[s] an intent to begin the EEO process." *Culpepper v. Schafer*, 548 F.3d 1119, 1122 (8th Cir. 2008) (emphasis added) (quoting EEOC Management Directive 110, Ch. 2, § I.A, n.1 (Nov. 9, 1999) (citing *Kinan v. Cohen,* EEOC Appeal 05990249, 1999 WL 320546 (May 6, 1999); *Floyd v. Temple,* EEOC Appeal 05890086, 1989 WL 1006770 (June 22, 1989)); *see also, e.g., Osuagwu v. Peake,* EEOC Appeal 0120081307, 2008 WL 2264405 (May 20, 2008) (same); *Thompson v. Chertoff,* EEOC Appeal 0120080545, 2008 WL 382208 (Feb. 4, 2008) (same). And an agency's interpretation of its own regulation—including the EEOC's interpretation of this one—is generally controlling. *See Auer v. Robbins,* 519 U.S. 452, 461 (1997) (holding that an agency's interpretation of its own regulation is "controlling unless 'plainly erroneous or inconsistent with the regulation'" (quoting *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 359 (1989))); *see also*

*Culpepper*, 548 F.3d at 1122-23 (holding EEOC's interpretation of 45-day contact provision is controlling); *Kraus v. Presidio Tr. Facilities Div./Residential Mgmt. Branch*, 572 F.3d 1039, 1046 (9th Cir. 2009) (same); *Klugel v. Small,* 519 F. Supp. 2d 66, 71-72 (D.D.C. 2007) (same).

There can be no dispute that, at minimum, Christafore is a person "logically connected with the EEO process" and that Nash contacted her within the requisite timeframe. *Culpepper*, 548 F.3d at 1122. To be sure, Christafore holds the title of "Reasonable Accommodation Program Coordinator," works in the FBI's Office of EEO Affairs Division, and Nash emailed her on the evening of December 5, 2022, the day he left the program.

But Nash must also demonstrate an intent to begin the EEO process. And on this point, he fails. Nash's December 5, 2022 email simply describes his complaints, without a call to action, and concludes with a thank you and an apology. (See R. 37-1, Ex. 18 ("I apologize for any inconvenience, and I want to thank everyone again who has helped me along the way. I wish you all the best of luck in all your current and future endeavors.").) This email does not show an intent to pursue any kind of claim. *See Welsh v. Hagler*, 83 F. Supp. 3d 212, 221 (D.D.C. 2015) (email that "merely describes the events that transpired" without "ask[ing] the recipients to take any action at all" did not demonstrate requisite intent to initiate EEO process). Nor do his later communications, including his December 9, 2022 "Personal Statement," which only expresses "hope that the FBI will learn from this experience so that it will

not happen to someone else in the future," and again ends with Nash thanking the reader. (See R. 37-1, Ex. 26 at 5.)

That said, the court finds tolling the 45-day contact requirement until May 2023, when Nash's attorney contacted the FBI's EEO office, warranted. Equitable tolling is permitted when the complainant shows: (1) he "was not notified of the [45-day] time limit[ ] and was not otherwise aware of" it; (2) he did not know and reasonably should not have known that the discriminatory matter or personnel action occurred; (3) "despite due diligence" he was "prevented by circumstances beyond his . . . control from contacting the counselor within the time limits"; or (4) "other reasons considered sufficient by the agency or the Commission." 29 C.F.R. 1614.105(a)(2). It is undisputed that the FBI did not advise Nash of any EEO rights or procedures, and the government offers nothing to counter Nash's testimony that he was not "notified of the [45-day] time limit[ ]" or "otherwise aware" of it. *See id.*; (see also R. 43, NSOAF ¶ 84; R. 46, GRNSOAF ¶ 84).

And despite the government's urging, this court declines to impute constructive knowledge to Nash simply because he retained an attorney within days of the events at issue. (R. 38, Govt.'s Mem. at 7-8; R. 45, Govt.'s Reply at 4-5.) The government cites no support for such a finding and the court's own research did not reveal any. Moreover, imposing such a standard would: (1) require the court to assume without evidence that Nash's first attorney was aware of the 45-day contact requirement; (2) hold *pro se* and represented plaintiffs to different standards; and (3) run contrary to the remedial purposes of the Rehabilitation Act. *See Johnson*, 47 F.3d

14

at 917 ("The [45] day statute of limitations is not reasonable if agencies and courts do not liberally construe the [(a)(2)] exceptions." (quoting *Myles v. Schlesinger,* 436 F. Supp. 8, 18 (E.D. Pa. 1976))).

## B.     Constructive Discharge

Turning to the merits of the case, the government argues that summary judgment is proper because Nash did not suffer an adverse employment action—he left Quantico of his own accord about 32 hours after arriving and does not plead constructive discharge from training. (R. 38, Govt.'s Mem. at 8-10.) The court agrees that a truly voluntary resignation cannot amount to an actionable employment action. But just as the government deemed the factual allegations in Nash's administrative charge "tantamount to allegations of constructive removal," (R. 37-1, Ex. 29 at 1, n.2), so too does this court with respect to his complaint, (see, e.g., R. 1 ¶ 21 ("As a result of the FBI's failure to provide these accommodations, Nash had to leave the training at Quantico and return home.")). The Federal Rules of Civil Procedure "do not require a plaintiff to plead legal theories," and a plaintiff may alter or refine any theories he did plead—including at the summary judgment stage—provided that any new theories rely on the same facts. *Zall v. Standard Ins. Co.*, 58 F.4th 284, 295 (7th Cir. 2023) (citing *Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852, 859 (7th Cir. 2017)). Based on the circumstances presented, this is the case here, and the court declines to grant summary judgment on this basis.

But the government further asserts that there is no evidence of working conditions "so intolerable as to force a reasonable person to leave," as required to successfully plead a constructive discharge claim. (R. 45, Govt.'s Reply at 10 (quoting

*EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 440 (7th Cir. 2000)); *Pa. State Police v. Suders*, 542 U.S. 129, 141 (2004) ("Under the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes."). On this point, the court agrees. No reasonable jury could find that Nash's only reasonable option was to leave Quantico and abandon his mandatory training. *Sansone v. Donohue*, 98 F. Supp. 3d 946, 956 (N.D. Ill. 2015) (summary judgment for employer proper on constructive discharge claim where employee had options other than resignation). Nash had other options available to him besides walking away.

Indeed, Nash had reasonable temporary solutions he never explored before departing. *See Sansone*, 98 F. Supp. 3d at 956 (granting employer summary judgment on constructive discharge claim where there was "no evidence to suggest that [employee] was without temporary short-term solutions" at time of resignation). For example, Nash could have visited the cafeteria upon his arrival at Quantico and conferred with more than a single non-supervisory cafeteria employee regarding his request for a separate safe plate as Decker had instructed. (R. 37, GSOF ¶¶ 18-19; R. 43, NRGSOF ¶¶ 18-19.) Nash also could have raised concerns with someone other than SSA Carpenter—who said he was not aware of Nash's request—including SA Brown, or Christafore or Decker, both of whom were already handling Nash's concerns. And to the extent Nash needed access to a microwave while his accommodations request was pending, he could have asked a cafeteria employee about the same. Finally, Nash could have informed someone that he was considering

leaving and explained why. *See Kinney v. St. Mary's Health, Inc.*, 76 F.4th 635, 647-48 (7th Cir. 2023) (granting summary judgment for employer on constructive discharge claim in part because employee did not communicate with employer about intent to resign before doing so). Nash did not exercise these reasonable options.

Nash counters that SSA Carpenter told him he was unaware of Nash's accommodations request, the "reasonable accommodation person" was out for several more days, and Nash could not leave the campus or allow his wife to bring him food. (R. 43, NSOAF ¶¶ 65-66, 68; R. 46, GRNSOAF ¶¶ 65-66, 68.) Even accepting this testimony as true, there is no evidence that SSA Carpenter or any other FBI employee outright denied Nash's accommodations request. Nor could a reasonable jury interpret SSA Carpenter's statements to mean that Nash would not "be receiving accommodations[,] period," as Nash says he believed. (R. 43, NSOAF ¶ 68(i).) As such, summary judgment is proper on Nash's constructive discharge claim.

## C.    Failure to Accommodate

Nash's claim may also be assessed under the failure-to-accommodate theory of liability, which requires Nash to show only that: (1) he was a qualified individual with a disability; (2) the FBI was aware of his disability; and (3) the FBI failed to reasonably accommodate his disability. *Yochim v. Carson*, 935 F.3d 586, 590 (7th Cir. 2019). Only the accommodation element is at issue here. It carries with it an obligation by Nash and the FBI to engage in an "interactive process" to determine an appropriate accommodation. *Id.* at 591. But there is no independent cause of action for a breakdown of that process. *Sansone v. Brennan*, 917 F.3d 975, 980 (7th

Cir. 2019). Rather, liability arises only if the FBI's "failure to engage in an interactive process resulted in a failure to identify an appropriate accommodation," *Rehling v. City of Chi.*, 207 F.3d 1009, 1016 (7th Cir. 2000) (footnote omitted), and then only if such an accommodation was possible, *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005). Courts examine the entirety of the interactive process to determine fault for any breakdown because the "last act . . . is not always the cause of a breakdown." *Sears*, 417 F.3d at 806 (holding that courts "must examine the process as a whole to determine whether the evidence requires a finding that one party's bad faith caused the breakdown"). Even if the employee resigns prior to accommodation, the employer may be liable if it failed to engage in meaningful communication or obstructed, delayed, or otherwise acted in bad faith during the interactive process. *See Beck v. Univ. of Wisc. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996).

The FBI delayed, albeit briefly, in rendering a decision on Nash's reasonable accommodations request. Three days after Nash's submission of a formal request to Christafore, he arrived at Quantico for training without an official response. While an unreasonable delay can evidence discrimination, *Jay v. Intermet Wagner Inc.*, 233 F.3d 1014, 1017 (7th Cir. 2000), the short delay here was not unreasonable. To be clear, an employer is "not required to immediately provide the exact accommodation requested." *Monroe v. Jewel Food Stores, Inc.*, No. 18 CV 1499, 2021 WL 534662, at *3 (N.D. Ill. Feb. 12, 2021) (citing *Sears*, 417 F.3d at 802)). In fact, provided the accommodation offered *is reasonable*, the employer need not offer the requested

accommodation at all. *Jay*, 233 F.3d at 2017. Further, courts have found even months-long delays reasonable where the employer "clearly participate[d] in the interactive process in good faith," *Monroe*, 2021 WL 534662, at *4 (*citing, e.g., Jay*, 233 F.3d at 1017 (finding 20-month delay reasonable where employer considered employee for reassignment on weekly basis and kept employee on medical layoff until reassigned)), or there was no indication of bad faith, *Cloe v. City of Indianapolis*, 712 F.3d 1171, 1178-79 (7th Cir. 2013) (5-month delay not unreasonable where employer-provided interim accommodations were deemed "insufficient" but only in retrospect), *overruled on other grounds by Ortiz v. Werner Enterps.*, 834 F.3d 760, 764 (7th Cir. 2016); *cf. Johnson v. Brennan*, No. 17 CV 8878, 2020 WL 1139253, at *7 (N.D. Ill. March 9, 2020) (5-month delay in accommodation was unreasonable where the employer "completely ignored multiple requests for accommodation" and failed to explain its delay).

Here, the FBI and Nash actively engaged in the interactive process before he arrived at Quantico. Indeed, both Christafore and Decker described the various accommodations Nash could expect to receive upon arrival. And while nothing was formalized with respect to Nash's dorm room accommodations when he arrived, the brief delay between his arrival and departure is simply not long enough to be actionable, particularly given that Nash did not pursue any aforementioned interim options before taking the drastic step of leaving Quantico.

Nash complains that he was unable to eat anything "[d]uring his 31-34 hours" at Quantico other than the snack foods he brought with him. (R. 44, Pl.'s Mem. at 4.)

19

But that was at least partially his choice. Against Decker's recommendation that he visit the cafeteria upon arrival to get the lay of the land and her warning that Nash may need to speak with more than one employee, Nash did not visit the cafeteria on his first day at Quantico and did so just once on his second day, giving up after speaking to a single employee. (R. 37, GSOF ¶¶ 19-20, 31; R. 43, NRGSOF ¶¶ 19-20, 31.) Moreover, while Nash was not provided with a microwave or a refrigerator in his dorm room when he arrived as requested, it is undisputed that he stored his medication in a communal refrigerator in the interim and did not ask for access to a microwave upon arrival. (R. 37, GSOF ¶¶ 35-36, 38; R. 43, NRGSOF ¶¶ 35-36, 38.) Nor is there evidence that Nash brought any food with him to refrigerate or microwave. Although Nash complains that SSA Carpenter told him he could not leave and his wife could not bring him food—a disputed claim that must be resolved in Nash's favor at this stage—there also is no evidence suggesting Nash tried to clarify the inconsistency between Carpenter's statement and the November 9, 2022 welcome email and his conversations with Christafore. Last, Nash admits that he did not stay at Quantico long enough to assess whether the campus leave policies adequately addressed any gaps in his needs. (R. 37, GSOF ¶ 49; R. 43, NRGSOF ¶ 49.)

"That a plaintiff wants more or different accommodations does not make what he did receive unreasonable." *Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 962 (7th Cir. 2021); *see also Jay*, 233 F.3d at 1017 ("[A]n employer is not required to provide the particular accommodation that an employee requests."); *Bourke v.*

20

*Collins*, 142 F.4th 918, 922 (7th Cir. 2025) ("An employer must only provide a reasonable accommodation, not a perfect one."). Because Nash had interim options and the parties were in the midst of the interactive process when he left Quantico, no reasonable jury could find the FBI responsible for a failure to accommodate Nash during his mandatory training.

Finally, Nash complains that the FBI failed to accommodate him after he left Quantico on December 5, 2022, because it did not allow him to return. (R. 44, Nash's Resp. at 12-14.) But there is nothing from which a reasonable jury could find the government liable on this point, either. Indeed, taking the disputed facts in Nash's favor as this court must, the most that can be said is that after Nash left Quantico and sent an email to Christafore, Bob, and others on December 5 indicating he had "voluntarily removed [him]self" from the training program, was "on [his] way home" and wished everyone "the best of luck in all [their] current and future endeavors," (R. 43, NSOAF ¶ 70; R. 46, GRNSOAF ¶ 70), Nash had a change of heart that the FBI briefly entertained. But Nash's departure "rendered h[is] [reasonable accommodation] request moot at that point in time," *Santos-Means v. Sherriff's Off. of Cook Cnty.,* No. 12 CV 8804, 2016 WL 6092600, at *5 (N.D. Ill. Oct. 19, 2016), because the obligation to accommodate simply does not include an obligation to reinstate an employee following their resignation, *Wooten v. Acme Steel Co.*, 986 F. Supp. 524, 528 (N.D. Ill. 1997) (noting that "the ADA's reasonable accommodation provisions refer to changes in 'ordinary work rules, facilities, terms, and working conditions,' not altering the employment relationship itself"). There is no other way

to interpret Nash's December 5 email other than as a notice of resignation, and as stated in Nash's offer letter, "[t]rainees who voluntarily resign are barred from returning to the Special Agent program in the future." (R. 37-1, Ex. 1 at 7.) This combined with the fact that Nash had interim accommodation options to pursue when he abandoned the interactive process which may have been sufficient in and of themselves means that Nash does not get another bite at the apple simply because certain FBI officials considered the possibility of allowing him to return. Accordingly, the government is also entitled to summary judgment under a failure-to-accommodate theory.

## Conclusion

For the foregoing reasons, the government's motion for summary judgment is granted.

ENTER:

Young B. Kim
United States Magistrate Judge